# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) Jason Hearn, as the representative of a class of similarly situated persons, and on behalf of the Aberdeen Dynamics Supply, Inc. Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>(2) Aberdeen Dynamics Supply, Inc.,<br><br>Defendant. | Case No. 24-cv-00605-JFJ<br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiff Jason Hearn ("Plaintiff"), as the representative of the Class described herein, and on behalf of the Aberdeen Dynamics Supply, Inc. Employee Stock Ownership Plan (the "Plan"), brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Aberdeen Dynamics Supply, Inc. ("Defendant"). This case is about Defendant's failure to implement a prudent investment policy for the Plan accounts of former employees. The foregoing violated Defendant's fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1).

## PARTIES

2.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The Plan is sponsored by Defendant for the benefit of its current and former employees.

3.      Plaintiff Jason Hearn is a natural person and a resident of Owasso, OK. He is a current participant in the Plan. He is more than 20 years from the Plan's normal retirement age of 65. He worked for Defendant between 2010 and 2019.

4.      After Plaintiff left the company, all shares of Defendant's stock allocated to his account in the Plan were sold, consistent with the terms of the Plan and Defendant's policy and practice. However, the distribution terms of the Plan do not allow Plaintiff or other former employees to access their accounts. Instead, Plaintiff's account must remain in the Plan for a minimum of 10 years after the year in which he left the company, with installment

distributions beginning no earlier than the 6th year after his departure. During this holding period, Defendant has not invested the funds held on Plaintiff's behalf in an appropriate manner given the period over which the funds will be held. Plaintiff's account and his future distributions from the Plan would be worth more if Defendant prudently investigated and implemented an investment policy for the funds that it holds on behalf of Plaintiff and other former employees in the Plan.

5. Defendant Aberdeen Dynamics Supply, Inc. is the sponsor and administrator of the Plan. In its capacity as the administrator of the Plan, Defendant has broad oversight powers with respect to how the Plan is managed, including the power to set a prudent investment policy with respect to funds held by the Plan and to hire third-party advisors or investment managers to assist in the investigation and implementation of a prudent investment policy. Defendant is the "fiduciary" of the Plan as defined by 29 U.S.C. §§ 1002(21)(A)(i) & (iii) because Defendant "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," and Defendant "has any discretionary authority or discretionary responsibility in the administration of such plan."

## JURISDICTION AND VENUE

6. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) & (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

7. This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant's violations of ERISA occurred in Tulsa, OK, where Defendant is located and where the Plan is administered.

## DEFENDANT'S VIOLATIONS OF ERISA

### Former Employee Accounts in the Plan

9. Defendant established the Plan in 2008 to provide retirement benefits to employees. There are around 250 participants in the Plan. Around half of the participants in the Plan are former employees. Each Plan participant is entitled to a benefit that is determined by the value of their individual account in the Plan at the time that it is distributed.

10. The Plan awards shares of Defendant's stock to employees while they work for the Defendant. Those shares are held in the Plan on employees' behalf and legally owned by the Plan. Participants have no control over when or how the shares are sold.

11. In around 2020, Defendant began requiring that company stock held in the Plan on behalf of former employees be sold. This procedure is effectively a reallocation within the Plan. Each year, Defendant contributes cash to the Plan in an amount equal to the value of departed employees' shares, crediting their accounts with cash *pro rata*. The stock is then reallocated to the accounts of current employees.

12. Plan participants generally cannot obtain a distribution of their account at the time that it is converted to cash. Instead, former employee accounts generally must remain in the Plan for a minimum of 10 years after their departure, with annual installment distributions

available beginning no earlier than the 6th year after their departure.[1] This means that former employees cannot immediately roll their accounts into an independent retirement account (IRA) or a new employer's plan. The only way for former employees to obtain a distribution sooner is to reach age 65, die, or become permanently disabled.

13. During the holding period, the Plan accounts of former employees participate *pro rata* in the investment experience of the funds that the Plan holds for their benefit. If the Plan receives earnings through income and gains on underlying assets that support former employees' account values, those earnings must be allocated to the individual accounts of former employees in proportion to their account balances. When their accounts are distributed from the Plan, former employees are entitled to receive their balance at the time that it was converted to cash plus any investment earnings allocated to their account since that time.

14. Participants have no control over how the funds allocated to their account are invested and cannot direct Defendant to select a different investment on their behalf. Defendant has total discretion and control regarding how to invest the funds that the Plan holds on behalf of former employees.

15. Defendant has failed to implement a prudent process for investing the funds held in the Plan on behalf of former employees and has failed to monitor the performance of the investments. These funds remain in a bank deposit account.

---

[1] The terms of the Plan also allow Defendant to decline to distribute the accounts of participants under age 65 until the Plan pays off the loan used to acquire shares of Defendant's stock. That loan is not scheduled to be paid off until 2043.

**The Prudent Investor Rule**

16. Under ERISA, fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) ("[The] common law prudent investor' rule [was] codified by ERISA.").

17. Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); *see also* Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90(a) (fiduciaries must pursue "an overall investment strategy[] which … incorporate[s] risk and return objectives reasonably suitable to the trust.").

18. The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k.

19. Rather than avoid risk, fiduciaries must manage risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach, *et al.* "The Prudent Investor Rule and Market Risk: An Empirical Analysis." Journal of Empirical Legal Studies Volume 14, Issue 1, 129:168, 130 (March 2017) ("The prudent investor rule … reorients trust investment from risk avoidance to risk management[.]").[2]

20. An appropriate investment strategy suited to the objectives of the plan must consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("A fiduciary's determination with respect to an investment" must "us[e] appropriate

---

[2] Available at www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.

investment horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset selection … requires sensitivity to the trust's investment time horizons[.]"). A plan's risk tolerance "largely depends" on how long funds will be held. *Id.* cmt. e(1).

21. In order to maintain investments that are suited to participants' investment objectives and risk tolerances, a prudent fiduciary must understand the risk and return characteristics of different asset classes.

22. Stocks generate the highest long-term average returns, although they exhibit the highest short-term volatility. *See* 3d Rest. § 90 cmt. l ("Historically, corporate stocks have provided greater total return over the long term than bonds but ordinarily entail higher risks[.]").

23. Cash equivalents generate the lowest long-term average returns, but they reduce volatility risk to close to zero. *See id.* ("Returns from these investments have traditionally been relatively low, but their convenience, liquidity, and safety … are especially useful in making modest amounts of trust funds productive for limited periods of time.").

24. Other assets typically fall in the middle, with the general rule being that bonds of longer duration or lower credit quality will produce higher long-term returns (albeit with higher risk) than bonds of shorter duration or higher credit equality. *See id.*

25. Real estate generates returns close to stocks and offers potential inflation protection and reduced volatility relative to stocks. *See id.* cmt. h(2) & cmt. o.

26. A prudent fiduciary would have understood these characteristics, which have held true for more than a century. A recent study found that for 140 years, over any given 10-year period, more volatile investments in stocks and real estate consistently compensated

long-term investors with higher returns and increased buying power, after adjusting for inflation.[3] *See* Òscar Jordà *et al.*, *The Rate of Return on Everything, 1870-2015*, 134 Q.J. ECON. 1225, 1241–45, 1284–85 (2019).

27. Conversely, assets invested in cash, despite nominally protecting the principal amount, are subject to the risk of loss of real buying power if cash returns do not keep pace with inflation. *Id.* at 1277 (reporting that "negative real rates [on cash] have been relatively common in modern financial history."). The prudent investor rule specifically warns of the risk of loss of buying power and the future income caused by investing solely in assets, such as bank deposit accounts, that do not provide capital growth:

> T]he trustee should recognize that in inflationary times a high-yield and low-growth (or no-growth) investment strategy, adhered to over a long period, would pose a risk not only to principal interests but also with respect to … future security; the effects of such a strategy would be comparable to a regular practice of invading principal.

Rest. 3d of Trusts § 90 cmt. c.

28. Whether a fiduciary satisfied its duty is a test of conduct and process. *Id.* cmt (e)(1) ("The test of prudence is one of conduct, not one of performance.").

**Prudent Investment of Former Employee Accounts**

29. Defendant did not engage in a reasonable or prudent process to determine an appropriate investment policy for Plan funds held on behalf of former employees. No prudent fiduciary would select a bank deposit account as the sole investment for these funds. Defendant further failed to monitor the performance of the investment of these Plan funds

---

[3] The one exception appears to have been looking back 10 years from the middle of the Great Depression. *See id.* at 1285. Every other rolling 10-year period over 140 years saw a payoff for growth-oriented investments in stocks and real estate. *See id.*

and remove any investment shown to be imprudent. Had Defendant done so, the imprudence of its investment (or lack thereof) of these Plan funds would have been plain.

30.     First, former employees have a long investment time horizon. Former employees' accounts will generally remain in the Plan for at least 10 years, and potentially longer (*see supra*, note 1). Even after their accounts are eligible for distribution from the Plan, the tax code encourages participants to continue to hold their funds in long-term accounts, which could be the Plan, an IRA, or another employee retirement plan.[4] Accordingly, formerly employees can tolerate short-term risk associated with market volatility in their accounts. The more salient risk to former employees is the loss of real buying power over the duration of their investment time horizon due to inflation.

31.     Second, former employees need their Plan balances earned during their employment to continue to grow to increase their future income streams in retirement. The objective of retirement plans is to provide retirement income. *See* Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822, at 73825 (Dec. 1, 2022) (emphasizing "the interests of the participants and beneficiaries in their retirement income" as the principal concern of ERISA fiduciaries). The average account balance that Defendant holds in the Plan on behalf of former employees is around $125,000, which will not provide sufficient retirement income on its own. *See* PwC, "Retirement in America: Time to rethink and retool" at 4 (2021) (finding that $120,000 is "hardly enough

---

[4] Plan accounts are tax-deferred retirement accounts under the tax code, and participants are subject to a 10% penalty tax and income tax on funds withdrawn and used before age 59.5. *See* 26 U.S.C. § 72(t); 26 U.S.C. § 501(a). Participants can avoid the penalty tax and continue to defer income tax by keeping their funds in the Plan or rolling their account balances into other tax qualified accounts, such as an IRA or another plan sponsored by an employer.

8

even without factoring in rising life expectancies and increasing healthcare costs.").[5] Accordingly, it is in furtherance of the objectives of the Plan and its participants to seek not only to maintain the buying power of participants' account balances but to increase their buying power through capital appreciation.

32. Given these risk tolerances, sensitivities, and objectives, no prudent fiduciary would keep all former employee funds in a bank deposit account. There is substantial risk that participants will lose the buying power that they earned while employed by Defendant before they receive their benefits from the Plan. Indeed, this is already happening, as the Plan's interest income on funds held for former employees between 2020 and the present has averaged around 2.01% per year, while inflation during the same period averaged 4.26% per year.

33. A prudently constructed investment policy based on former employees' risk tolerances, sensitivities, and objectives would seek capital appreciation by investing in growth-oriented assets such as diversified pools of stocks and real estate. *See* Rest. 3d of Trusts § 90 cmt. l ("[A] primary and proper attraction of common stocks is that they offer trustees a hedge against loss of purchasing power and may even, in appropriate trust situations, contribute to a deliberate effort to increase the real value of the trust estate."); *id.* cmt. g ("Significant diversification advantages can be achieved with a modest number of well-selected securities representing different industries and having other differences in their qualities."); *id.* cmt. h(2) ("[R]eal estate tends to have a negative or limited covariance with

---

[5] Available at https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.

stocks and bonds. Traditionally, it has also tended to offer a long-term hedge against inflation.").

34. Had Defendant monitored asset class performance during recent 5- and 10-year periods, this conclusion would have been plain. Investing all former employee funds in cash is a recipe to reduce the benefits that will ultimately be paid. Participants do not benefit from short-term volatility protection while their funds are unavailable for distribution, but they lose a substantial opportunity for gains due to the lack of investment in stocks and real estate during that time.

**10-Year Average Annual Returns**[6]

|  | 2023 (2014–2023) | 2022[7] (2013–2022) | 2021 (2012–2021) | 2020 (2011–2020) |
|---|---|---|---|---|
| **Stocks** | 11.40% | 12.03% | 16.24% | 13.74% |
| **Real Estate** | 7.69% | 6.86% | 12.03% | 9.10% |
| **Cash** | 1.25% | 0.76% | 0.63% | 0.64% |

**5-Year Average Annual Returns**

|  | 2023 (2019–2023) | 2022 (2018–2022) | 2021 (2017–2021) | 2020 (2016–2020) |
|---|---|---|---|---|
| **Stocks** | 15.05% | 8.65% | 17.92% | 15.36% |
| **Real Estate** | 7.09% | 3.91% | 12.06% | 6.66% |
| **Cash** | 1.88% | 1.26% | 1.14% | 1.20% |

---

[6] Asset classes are represented by the following broad-based securities indexes: Stocks – Dow Jones US Total Stock Market; Real Estate – FTSE Nareit All REITs; Cash – 3-Month Treasury Bill.

[7] The year 2022 is notable because stocks and real estate were down 20%–25% on the year, but the 5- and 10-year averages remained substantially higher than cash. This means that even if participants are unfortunate enough to be forced to withdraw their accounts during a severe downturn, they will generally be better off having been invested in stocks and real estate during the hold period than cash.

35. Even former employees who leave the company less than 5 years from normal retirement age should not have all their funds invested in cash. The industry consensus prudent asset allocation for employees expecting to retire in less than 5 years calls for around 50% of their accounts to be invested in stocks. *See* S&P Target Date Scorecard, Mid-Year 2023, at 5–7.[8]

36. Additionally, because the Plan focuses on the investment in Defendant's stock on behalf of participants while they are employed by Defendant, it is consistent for Defendant to invest in the stocks of other companies after reallocating employees' company shares.

37. While ERISA does not require Defendant to customize individualized investment strategies ideally suited to each participant's circumstances, Defendant cannot ignore the time horizons and objectives applicable to funds allocated to former employees' accounts in the Plan. Defendant had a fiduciary duty to (1) implement a prudent process for investing these Plan funds; (2) investigate and implement an investment strategy for the portfolio as a whole that was tailored to the time that such funds would be held in the Plan and the objectives of the Plan; and (3) monitor the investment of Plan funds to ensure it remained prudent.[9] Sticking former employee balances in a bank deposit account and leaving them there did not satisfy Defendant's duties.

---

[8] Available at https://www.spglobal.com/spdji/en/documents/commentary/commentary-sp-target-date-scorecard-mid-year-2023.pdf.

[9] An alternative to navigating this duty would be for Defendant to change the terms of the Plan to allow participants control of their funds, either by allowing participants to promptly roll their account balances to an IRA or other qualified plan when the leave the company, or by allowing participants to direct their investments inside the Plan. *See* 29 U.S.C. § 1104(c). Because Defendant has not taken either action, Defendant remains responsible for prudently investing the funds held for former employees in the Plan.

### *Losses to the Plan*

38.   ERISA "does not prescribe how courts are to measure loss." *Ramos v. Banner Health*, 1 F.4th 769, 778 (10th Cir. 2021). An approach adopted by courts from trust law, and approved by the 10th Circuit, is to "restor[e] plan participants to the position in which they would have occupied but for the breach of trust." *Id.* In cases that involve "a loss resulting from lost investment opportunities," participants "need not provide a perfect estimate of how much loss the breach caused." *Id.*

39.   The appropriate remedy in this case is to credit to the Plan with the difference between its bank interest earnings and the earnings that the Plan would have been received had Defendant invested those funds appropriately in a diversified pool of stocks. This method of measuring loss provides "the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust." *Id.*

40.   Had Defendant re-invested former employee accounts in a mutual fund that invests in all stocks in the S&P 500 after Defendant began selling their company shares in 2020, the Plan would be worth around $8.4 million more than it is today. The Plan's losses will continue to accrue until Defendant pays the Plan its lost earnings.

41.   The additional earnings that the Plan would have received had Defendant implemented a prudent process, invested prudently, and monitored the Plan's investments and removed investments shown to be imprudent, would have been allocated to the accounts of former employees, including Plaintiff. Upon recovery of these lost earnings, the Plan must allocate the recovery proportionally to former employees whose accounts were harmed by Defendant's breach, including Plaintiff.

## PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE

42.  Plaintiff lacked knowledge of material information to support his claims until recently. Plaintiff was not and aware of the processes engaged in by Defendant in determining the investment strategy for his account or the Plan as a whole, or Defendant's monitoring of the Plan's investments and investment strategy. Plaintiff's allegations are based on inferences drawn from the facts adduced to date and are made upon information and belief and in reliance on the investigation of counsel.

## PLAN-WIDE RELIEF

43.  29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

44.  Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

45.  Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interest is aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

46.  Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

47. Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants in the Plan whose Plan accounts have been reduced to cash since 2020, and their beneficiaries and alternate payees of record, excluding any such participants who exercised any discretion or control on behalf of Defendant concerning how to invest Plan funds.

Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has around 125 former employees whose Plan accounts have been reduced to cash.

48. Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was an Plan participant and Plaintiff suffered injuries as a result of Defendant's violations of ERISA. Defendant treated Plaintiff consistently with other Class members with regard to the Plan. Defendant's improper actions affected all Plan participants similarly.

49. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

50. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.    Whether Defendant was a fiduciary with respect to the Plan and the scope of its fiduciary duties;

      b.    Whether Defendant failed to comply with the ERISA fiduciary standard of prudence in violation of 29 U.S.C. § 1104(a)(1);

      c.    The proper form of equitable and injunctive relief; and

      d.    The proper measure of monetary relief.

51. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

52. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

53. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an

interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

54. Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I

### 29 U.S.C. § 1104(a)(1)

55. Plaintiff incorporates the foregoing paragraphs by reference.

56. Defendant is the Plan fiduciary with discretion concerning how the Plan's assets allocated to the accounts of former employees are invested.

57. Defendant violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to implement a prudent process to invest the Plan's assets, failing to prudently invest Plan assets in a manner consistent with the investment objectives of the Plan and its participants, and failing to monitor the Plan's investments to ensure their continuing prudence and remove those investments that have become imprudent.

58. Defendant's violation of 29 U.S.C. § 1104(a)(1) caused the Plan injury in the form of lost investment earnings, and Defendant's deficient fiduciary conduct threatens future

harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect Plaintiff's Plan account.

59. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

## **PRAYER FOR RELIEF**

60. Wherefore, Plaintiff prays for judgment against Defendant and for the following relief:

   A. Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

   B. Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as the class representative, and certify his counsel as class counsel;

   C. Order Defendant to make good to the Plan all losses resulting from its violations of ERISA;

   D. Impose equitable and injunctive relief sufficient to protect Plan participants, including changes to Defendant's investment process and/or appointment of independent investment advisors and managers;

   E. Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

   F. Award prejudgment and post-judgment interest; and

G. Award such other and further relief as the Court deems just and equitable.

Dated: December 13, 2024

**BRYAN GARRETT PLLC**

/s/Bryan Garrett
Bryan Garrett
119 N. Robinson, Suite 650
Oklahoma City, OK 73102
Telephone: (405) 839-8424
Facsimile: (888) 261-7270
bryan@bgarrettlaw.com

**ENGSTROM LEE LLC**

Charlie C. Gokey, MN Bar No. 402225*
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
cgokey@engstromlee.com

*pro hac vice application forthcoming*

*Counsel for Plaintiff*